GEORGE LANDER

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Springfield September 28, 1882.*

1. ERROR—*when will not reverse.* This court will not reverse a conviction in a criminal case for every trivial error, without regard to whether it exerted an improper influence over the jury or not.

2. INSTRUCTIONS—*their office.* The office of instructions is to inform the jury what the law is relating to the case in hand, and to assist them in applying it to the evidence before them; and it is the duty of courts of review, in criminal cases, to see that no substantial error is committed in attempting to accomplish these objects, which may prejudice the rights of the accused, and this is all the law requires.

3. EVIDENCE—*acts, declarations and exclamations of persons as part of the res gestæ.* Where it becomes important to show, upon the trial of a cause, the occurrence of any fact or event, it is competent and proper to also show any accompanying act, declaration or exclamation which relates to, or is explanatory of, such fact or event. Such acts, declarations or exclamations are known as *res gestæ.*

4. On the trial of one upon a charge of rape, two witnesses were called who were near by and witnessed the perpetration of the offence, and who testified they saw and readily recognized the accused near the scene of the transaction on the next day thereafter, and that one called the attention of the other to the accused, exclaiming, "There goes the man!" and that the other replied, "Yes, there he goes." The defendant objected to the witnesses repeating their exclamations made at the time, but the court permitted the same: *Held,* no error.

5. The true test of the admissibility of such testimony is, that the act, declaration or exclamation must be so intimately interwoven with the principal fact or event which it characterizes, as to be regarded a part of the transaction itself, and also *to clearly negative any premeditation or purpose to manufacture testimony.*

WRIT OF ERROR to the Circuit Court of Macon county; the Hon. C. B. SMITH, Judge, presiding.

Mr. ALBERT G. WEBBER, for the plaintiff in error.

Mr. JAMES McCARTNEY, Attorney General, for the People.

Mr. JUSTICE MULKEY delivered the opinion of the Court:

At the December term, 1881, of the Macon county circuit court, George Lander, plaintiff in error, was tried and convicted of the crime of rape upon the person of Mary Sturgis, and was duly sentenced to the penitentiary for a period of twenty-five years, in pursuance of the verdict of the jury, and the accused brings the case here for review, and asks a reversal on several grounds, but chiefly because the evidence does not, as is alleged, sustain the conviction.

It is first objected the court erred in the giving, refusing and modification of instructions. It is seldom instructions prepared in the hurry and excitement of a trial are drawn with perfect accuracy, and it is conceded they were not in

the present case. We are of opinion, however, none of the errors complained of are of such a character as to have possibly prejudiced the rights of the accused. To reverse for every trivial error, without regard to whether it exerted an improper influence over the jury or not, would render our Criminal Code practically inoperative. The office of instructions is to inform the jury what the law is relating to the case in hand, and to assist them in applying it to the evidence before them, and it is the duty of courts of review, in criminal cases, to see that no substantial error is committed, in attempting to accomplish these objects, which may possibly prejudice the rights of the accused, and this is all the law requires. Without going into details, we may say, in general terms, that we have carefully examined the instructions, and the several objections urged against them, and the action of the court with respect to them, and are unable to perceive anything which, in our judgment, requires a reversal of the case. Taking the instructions as a whole, we think they fairly present the law applicable to the case, and that there is no just cause to complain on the grounds suggested.

The real and vital question in the case is, as is conceded by counsel for plaintiff in error, does the evidence sustain the conviction. That a rape was committed by some one upon Mary Sturgis, as charged in the indictment, is proved by the positive testimony of Minnie Blentz, Hattie Moore, Charlie Gouker, Warren Marthland, and Mary Sturgis herself, all of whom were, as they testify, eye witnesses to the fact. Indeed, there is no contention on this question. It is conceded the *corpus delicti* is fully established, the only controversy being as to whether the perpetrator of the offence and the accused are the same person, and to this question of identity most of the evidence is directed. The offence was committed at a place called the "Levee," near the Wabash railroad track, in the city of Decatur, about five o'clock of the

afternoon of the 3d of June, 1881. As the evidence offered
on behalf of the accused is embraced in a small compass, we
will, for the sake of convenience, consider it first.

Joseph Siegler, who resides about nine miles south-west of
Decatur, testifies that the accused, who had previously been
working for him, left his house early on the morning of the
day the offence was committed; that he left because he did
not need a hand by the month; that he had been harvesting
for him two days; that the defendant wore about the same
chin-whiskers then that he did at the time of the trial; that
the defendant's hat and clothes were the same that were
worn by him at witness' house. Mrs. Robert Cullen testi-
fied: "I was at Mrs. Sturgis' house when the prisoner was
brought here by Dave Sturgis, and heard Mrs. Sturgis say
then, that if this (pointing to the prisoner) was the same
man, he had cut off and colored his whiskers, and changed
his overalls, since yesterday. She said the man who out-
raged her wore striped overalls. I had the prisoner brought
back into the house, and we searched for striped overalls,
but did not find any." On cross-examination she further
says: "I can not prove the exact words used by Mrs. Stur-
gis, and don't remember just all she said about the whiskers
and striped overalls. The conversation I refer to was not
when Dave Sturgis brought the prisoner to the house, but
was on the evening of the rape, when Kate Mitchell and
myself were present." Mrs. Mitchell testifies that Mrs. Stur-
gis stated, on the evening of the rape, that the man who
ravished her wore striped overalls, and had light, sandy
whiskers, with some gray hairs in them. Sandy Rogan and
Isaac Rogan, who are barbers, swear that the accused was at
their shop about eleven o'clock A. M. of the day the offence
was committed, and that his whiskers were then about as
short and dark as they were on the following day, when he
was under arrest. The accused was also examined in his
own behalf. He denies all connection with the offence, and

gives rather a lengthy account of himself and of his where-abouts, both before and after the perpetration of the crime, and of the particulars of the arrest, and what occurred while in charge of Sturgis, who arrested him, which requires no special notice, as it has no material bearing on the vital question of identity. Some evidence was also offered in his behalf with the view of establishing an *alibi,* but it is so manifestly insufficient for that purpose we attach no import-ance to it. It is clear, from the weight of testimony, the accused was in the immediate vicinity of the place where the offence was committed, about the time of its perpetration, and that he was not therefore without an opportunity of committing the crime, provided he had the inclination to do so.

It will be perceived the whole of the testimony on the part of the accused was offered with the view of showing the description which Mrs. Sturgis gave, on the day of the occurrence, of the whiskers and overalls of the party who committed the assault upon her, does not correspond with the whiskers and overalls of the accused as they were shown to be on the trial, both before and after the commission of the offence, and upon this question,—if we include the accused,—the weight of evidence, so far as it depends upon the number of witnesses, is clearly with the plaintiff in error. Yet we do not attach the same importance to this fact, even if it had been established beyond all question, that counsel for the accused does. It does not necessarily or logically follow the accused is innocent, because the prosecutrix's description of him or his clothing turned out to be incorrect. In view of her extreme age,—she being then seventy-one years old,—and the suddenness and violence of the assault made upon her, which, as the evidence shows, greatly stunned her, and almost deprived her of her senses, we can well see how her recollection might be at fault about a matter of this kind. And if the identity of the accused depended upon her

testimony alone, although she positively identified him, we should, under the circumstances stated, feel great hesitancy in sustaining the conviction, if, indeed, we could do so at all. But the identity of the accused does not depend upon her testimony alone,—far from it. The account which she gives of the affair is as follows: "My name is Mary Sturgis. I am seventy-one years of age. On the afternoon of June 3, 1881, I was going out home, and got on the Wabash railroad track at or near a place in Decatur called the 'Levee.' A man passed by me, and brushed against me as he passed. He was going west on the track, and he went on until he got past Blentz' house, and there sat down upon the track. Just as I came up to where he was, a train came up rapidly, going east. He said, 'Look out for the train,' and stepped off on the north side of the track, and I on the south side. When the train had passed me I stepped on the track again, and the man came up at me with his pants unbuttoned. He caught me by the arm and threw me down with great violence, on my back, by the side of the track. I think I struck on some ties that were piled up near the track, and two of my ribs on my left side seemed to have been broken loose from my backbone by the fall. I was very much stunned by the fall, and rendered almost incapable of resistance. Still I resisted as much as I could. The man pulled up my clothes, and then placed his hand on my breast and pushed down so hard that I could scarcely breathe. When I opened my mouth to scream he placed one hand on my mouth. He laid with his whole weight on my body, and had actual sexual intercourse with me. This was done with great force and violence. I resisted all I could, but my legs seemed paralyzed. The whole thing was done forcibly, and against my will." Being asked if she could identify the person who committed the assault upon her, she pointed out the prisoner, saying, "That is the man." On cross-examination she said further: "I did not say, when this man was brought to my

house next day by my son David, in the presence of the prisoner, Mrs. Katie Mitchell and Mrs. Robert Cullen, that if he was the same man he had changed his whiskers by cutting them off and coloring them, and that he had also changed his overalls, and put on these brown ones instead of the striped ones that he wore the day before." And in this statement she is corroborated by David Sturgis, though contradicted, as we have already seen, by Mrs. Cullen and Mrs. Mitchell, and also by the accused.

Hattie Moore testifies: "I was with Minnie Blentz, and saw Mrs. Sturgis lying at the side of the railroad track. It was between four and five o'clock in the afternoon, and about two miles from the depot. I saw a man on his knees over her, and as he got up he made a motion with his hands as if pulling down her clothes. I was twenty-five yards away from them. We hallooed, then he got up, clumb the fence, and ran into the woods. Mrs. Sturgis sat there about five minutes, when she was helped home by Charley Athons. She seemed in great pain and distress, and complained of being internally injured. The next day Minnie Blentz called me to the window of her house and pointed to a man going west on the railroad, and said, 'There goes the man.' I said, 'Yes, there he goes.' The man we saw was this defendant. About two hours afterward Dave Sturgis brought the defendant to Blentz's house, and I recognized him as being the man I saw the morning before with Mrs. Sturgis. The defendant is the man I saw with Mrs. Sturgis. I recognized him by his general appearance, and by these clothes. The clothes here before me are the same he had on that day, and the hat is the same." It was admitted by defendant's counsel the clothes referred to by the witness, then lying on the floor before the witness, were the same clothes that defendant had on, or wore, on the day of his arrest, and the same that he wore when he left Siegler's house on the morning of the third day of June. On cross-examination the witness further

said: "I am fifteen years old. I never saw the man who outraged Mrs. Sturgis before I saw him with her then. I did not see his eyes, or the features of his face, then,—only saw the side of his face while he was getting up and running away. I was not nearer than twenty-five yards to him then. I saw some men at that season of the year wearing large straw hats and brown overalls, like those now before me (the prisoner's), going out over the same railroad track. I do not remember any particular thing or mark about the man's overalls or jacket on the day of the rape,—only remember the narrow black band on the hat. I have seen many large hats like that one, but never saw any other with a narrow black band on like that one."

Minnie Blentz, spoken of by the last witness as being in company with her at the time of the assault, testifies substantially to the same facts sworn to by Hattie Moore. Charley Gouker and Warren Marthland were also examined on behalf of the People, both of whom testify they were near the place testified to by the prosecutrix, and saw the assault made upon her; and while they did not get a fair view of the assailant's face, yet, from his general appearance, they give it as their opinion the accused is the same person. They further testify that when requested by the State's Attorney to pick him out from a number of other persons seated on the opposite side of the bar, they were able to do so.

Thus we see four persons, besides the prosecutrix, unimpeached and unimpeachable, so far as the record shows, who were eye witnesses of the assault, swearing, to the best of their opinion, the accused is the perpetrator of the offence, and this is denied by no one other than the accused himself. Under these circumstances we are of opinion the jury were fully warranted in reaching the conclusion they did.

As already appears from the testimony of Minnie Blentz and Hattie Moore, the accused, on the day following the assault, was passing near the place where it happened, when

the former, calling the attention of the latter to the accused, exclaimed, "*There goes the man*," the other replying, "Yes, there he goes," and the court, against the objections of the defendant, permitted the witnesses, in giving an account of the transaction, to repeat these exclamations, made at the time by the witnesses, and this is assigned for error. We do not think the point well taken. It is a well settled principle in the law of evidence, that whenever it becomes important to show, upon the trial of a cause, the occurrence of any fact or event, it is competent and proper to also show any accompanying act, declaration or exclamation which relates to, or is explanatory of, such fact or event. Such acts, declarations or exclamations are known to the law as *res gestæ*. It is not questioned that it was perfectly competent to show that the witnesses saw and readily recognized the accused, near the scene of the transaction, on the following day, as testified to by them, and it must be admitted the spontaneous exclamation, "There goes the man," with the response, "Yes, there he goes," is highly characteristic of the fact of their recognition. The true test, in all cases, by which the admissibility of such testimony is determined, is, the act, declaration or exclamation must be so intimately interwoven or connected with the principal fact or event which it characterizes, as to be regarded a part of the transaction itself, and also to clearly negative any premeditation or purpose to manufacture testimony, and we are of opinion the circumstances of this case clearly bring it within the rule.

Perceiving no substantial error in the record, the judgment will be affirmed.

*Judgment affirmed.*